# UNITED STATES *v.* DICKINSON.

NO. 77.

Argued December 13, 1946.—Decided June 16, 1947.

*Ralph S. Boyd* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Bazelon, Frederick Bernays Wiener* and *Marvin J. Sonosky.*

*Ernest K. James* argued the cause for respondents. With him on the brief was *J. H. McClintic.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

These are two suits brought under the Tucker Act (Judicial Code § 24 (20), 28 U. S. C. § 41 (20)) to recover the value of property claimed to have been taken by the Government. The suits were consolidated for purposes of the trial and though they present minor differentiating factors they may here, as below, be disposed of by a single opinion.

In order to improve the navigability of the Kanawha River, West Virginia, Congress authorized construction of the Winfield Dam, South Charleston. Act of August 30, 1935, 49 Stat. 1028, 1035, in connection with H. Doc. No. 31, 73d Cong., 1st Sess., pp. 2–4. The water above the dam was to be impounded to create a deeper channel and to raise the river pool level in that area. Notice of the proposed pool elevation was given to abutting landowners on July 1, 1936, and the dam was completed and officially accepted by the United States on August 20, 1937. The river was to be raised by successive stages from 554.65 feet to 566 feet above sea level. That level was not reached until September 22, 1938. As a result

of the raising of the river the land belonging to the respondents was permanently flooded. In addition, erosion attributable to the improvement damaged the land which formed the new bank of the pool.

Respondents recovered judgments for the value of easements taken by the United States to flood permanently lands belonging to them. Damages were also awarded for the erosion, based on the cost of protective measures which the landowners might have taken to prevent the loss. In addition, the court found that the United States had also acquired an easement for intermittent flooding of part of the land belonging to the defendants, and allowed judgment for the value of such an easement. The Circuit Court of Appeals affirmed the District Court's judgment. 152 F. 2d 865. We granted certiorari, 328 U. S. 828, because important questions were raised relevant to the determination of just compensation for the taking of private property by the Government.

*First.* The principal attack by the United States against the judgments is that both actions were outlawed. The applicable statute of limitations is six years. The complaints were filed on April 1, 1943. The Government argues that the statute began to run on October 21, 1936, when the dam began to impound water. In any event, it maintains that the six years began to run not later than on May 30, 1937, when the dam was fully capable of operation, the water was raised above its former level, and the property of the respondents was partially submerged for the first time. While on the latter view the time for taking had not run under the statute, Dickinson's claim would be barred because he acquired the land after that date.

The Government could, of course, have taken appropriate proceedings to condemn as early as it chose both land and flowage easements. By such proceedings it could have fixed the time when the property was "taken."

The Government chose not to do so. It left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy. These suits against the Government are authorized by the Tucker Act either as claims "founded upon the Constitution of the United States" or as arising upon implied contracts with the Government. (See the discussion of jurisdiction both in the opinion of the Court and in the concurring opinion in *United States* v. *Lynah,* 188 U. S. 445, and in *Tempel* v. *United States,* 248 U. S. 121.) But whether the theory of these suits be that there was a taking under the Fifth Amendment, and that therefore the Tucker Act may be invoked because it is a claim founded upon the Constitution, or that there was an implied promise by the Government to pay for it, is immaterial. In either event, the claim traces back to the prohibition of the Fifth Amendment, "nor shall private property be taken for public use, without just compensation." The Constitution is "intended to preserve practical and substantial rights, not to maintain theories." *Davis* v. *Mills,* 194 U. S. 451, 457. One of the most theory-ridden of legal concepts is a "cause of action." This Court has recognized its "shifting meanings" and the danger of determining rights based upon definitions of "a cause of action" unrelated to the function which the concept serves in a particular situation. *United States* v. *Memphis Cotton Oil Co.,* 288 U. S. 62, 67 *et seq.*

Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time. The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding "causes of action"—when they are born, whether they proliferate, and when they die.

We are not now called upon to decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation threatens. Assuming that such an action would be sustained, it is not a good enough reason why he must sue then or have, from that moment, the statute of limitations run against him. If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of *res judicata* against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck.

When dealing with a problem which arises under such diverse circumstances procedural rigidities should be avoided. All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really "taken." Accordingly, we find that the taking which was the basis of these suits was not complete six years prior to April 1, 1943, nor at a time preceding Dickinson's ownership. In this conclusion we are fortified by the fact that the two lower courts reached the same conclusion on what is after all a practical matter and not a technical rule of law.

Nothing heretofore ruled by the Court runs counter to what we have said. The Government finds comfort in *Portsmouth Co.* v. *United States,* 260 U. S. 327. But in that case the problem was whether by putting a gun battery into permanent position with a view to converting an area, for all practical purposes, into an artillery range, the Government inevitably took an easement in the land over which the guns were to be fired. The issue was not when a suit must be brought on a claim in respect to land taken by the United States, which is the issue before us, but whether there had been a taking at all.

*Second.* The Government challenges the compensation awarded for damage to the land due to erosion. It regards this damage as consequential, to be borne without any right to compensation. *Peabody* v. *United States,* 231 U. S. 530. Of course, payment need only be made for what is taken, but for all that the Government takes it must pay. When it takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away as a result of that flooding. The mere fact that all the United States needs and physically appropriates is the land up to the new level of the river, does not determine what in nature it has taken. If the Government cannot take the acreage it wants without also washing away more, that more becomes part of the taking. This falls under a principle that in other aspects has frequently been recognized by this Court. It was thus put in *Bauman* v. *Ross,* 167 U. S. 548, 574: "when part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that ac-

count." So, also, *United States* v. *Welch,* 217 U. S. 333; *United States* v. *Grizzard,* 219 U. S. 180. Compare *Sharp* v. *United States,* 191 U. S. 341, 355; *Campbell* v. *United States,* 266 U. S. 368. Congress has recognized that damage to the owner is assessed not only for the value of the part taken but also "for any injury to the part not taken." See § 6 of the Act of July 18, 1918, 40 Stat. 911, 33 U. S. C. 595. If the resulting erosion which, as a practical matter, constituted part of the taking was in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage, as the courts below held.

*Third.* At considerable expense, and with the consent of the War Department, Dickinson reclaimed most of his land which the Government originally took by flooding. The Government claims that this disentitled him to be paid for the original taking. The courts below properly rejected this defense. When the property was flooded the United States acquired the land and it became part of the river. By his reclamation, Dickinson appropriated part of what belonged to the United States. Whether the War Department could legally authorize Dickinson's reclamation or whether it was in fact a trespass however innocent, is not before us. But no use to which Dickinson could subsequently put the property by his reclamation efforts changed the fact that the land was taken when it was taken and an obligation to pay for it then arose.

*Fourth.* Judgment was also allowed against the United States for taking an easement for intermittent flooding of land above the new permanent level, and a value for such easements was assessed. We find nothing in this record to justify our setting aside these concurrent findings by two courts. *United States* v. *O'Donnell,* 303 U. S. 501, 508; *Allen* v. *Trust Co.,* 326 U. S. 630, 636.

*Judgments affirmed.*