fact and asking for information as to the status of the settlement claim. On February 16, 1948, the Commission advised the contractor that it would take no action on the claim until the civil fraud aspect of the case had been cleared by the Department of Justice.

On July 20, 1949, the contractor made a written demand for a final determination by the Commission. On July 25, 1949, the Commission replied that it would take no action on the claim until it had received written clearance from the Attorney General. The plaintiff filed the instant suit on June 14, 1950.

The plaintiff says that it filed its suit within one year after its demand for findings, and that seems to be true. As we have seen, Section 13 (c)(1) of the Contract Settlement Act expressly recognizes that an agency may provide for an intra-agency appeal, and the Maritime Commission did so provide. Section 13 (c)(2) seems to us to mean that if there is such an appeal, and there was in this case, it is the findings on the appeal, or the failure of the appellate body to make findings after demand, which set the periods of limitation in motion. Here the appellate body made no findings, hence the 90 day period did not run. No demand was made for such findings until July 20, 1949. At that time the one year period of limitation began to run. The plaintiff filed its suit within that year.

In the Erie Basin case, supra, we held that, although the agency had suspended action upon a settlement claim for the purpose of permitting the Department of Justice to investigate alleged fraud in connection with the claim, the contractor, having demanded findings, could sue in this court. In that case, as in this, the contractor sued within the time provided in the statute after making its demand for findings. The Government's argument seems to be that, since we held in the Erie case that the fraud investigation did not suspend the contractor's right to demand findings promptly and then sue, the limitation periods begin to run promptly regardless of the delay caused by the fraud investigation. But the events which cause the lim-

itation periods to begin to run are specified in the statute. They are either the issuance of findings, or the failure to issue findings after a demand. The former event is in the control of the Government; the latter in the control of the contractor. Here the former event did not occur, and the latter event did not occur until July 20, 1949. The plaintiff's suit was filed in time. The defendant's motion is denied.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.

## WEST VIRGINIA PULP & PAPER CO. v. UNITED STATES.

### No. 48813.

United States Court of Claims.
Feb. 3, 1953.

Edward C. McLean, New York City (Debevoise, Plimpton & McLean and Robert von Mehren, New York City, were on the briefs), for the plaintiff.

Ralph S. Boyd, Washington. D. C., Asst. Atty., James .M. McInerney, Asst. Atty. Gen., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff sues for just compensation for the temporary taking, by the Government, of a part of the plaintiff's leasehold of certain properties on the Cooper River near Charleston, South Carolina. The Government formerly owned the land here involved, and it asserts that, by the terms of the statute authorizing the conveyance of the land to the plaintiff's lessor, and the deed made pursuant to the statute, it had the right to take the property back, in the circumstances here present, without the payment of compensation.

In 1918 the Government acquired by eminent domain proceedings, for the use of the War Department, land including the land here involved. It constructed on a part of the land a port of embarkation, known as the Charleston Port Terminal or the Charleston Army Base Terminal. In 1923 the President transferred a portion of the land, including the Port Terminal, to the United States Shipping Board Bureau of the Department of Commerce. That Bureau operated the properties for a while and then leased them to the Port Utilities Commission of the City of Charleston, for operation as a commercial marine terminal. They were so operated from 1923 to June 15, 1936. These operations resulted in a loss to the United States of $232,616.36 for the twelve-year period. In the meantime the improvements on the properties had fallen into disrepair and a committee of the House of Representatives said in 1936 that nearly one million dollars would have had to be expended to put the terminal in good operating condition.

In 1936, the City of Charleston was still suffering severely from the depression. Its industrial development had been slow, and unemployment was extensive. The bill which became the law on which this suit depends, proposed to convey the Government's. Terminal properties to the City of

Charleston. It was sponsored in the Senate by Senator Byrnes, and in the House of Representatives by Representative Thomas S. McMillan. Representative McMillan said:

> "But I think the city is directly concerned with having this property with a view of interesting and attracting, if they can, some industrial concerns to come in there and make use of a property which is not now being used, and to try to get some activity which will be of value to the city.[1]

The statute as enacted, approved May 27, 1936, c. 465, 49 Stat. 1387, authorized and directed the Secretary of Commerce to convey the land in question to the City of Charleston by quitclaim deed. Section 2 of the statute said:

> "Sec. 2. The deed executed by the Secretary of Commerce shall include a provision prohibiting the city of Charleston from transferring the title to said property to any person, firm, or corporation and shall contain the express condition that in the event of a national emergency the property so conveyed, with all improvements placed thereon, may be taken upon order of the President by the United States for the use of the War Department during the period of such emergency."

As the bill had passed the Senate, it did not contain the provision prohibiting the City from transferring the title to the property. As it passed the house, it contained the words, "without cost to the United States" after the word "taken", in the clause "may be taken upon order of the President", and also the restriction against transferring the title. The Senate refused to accept the House amendments, and the bill went to conference. The conference committee, without any statement of reason, recommended that the House recede from its amendment inserting the words "without cost to the United States" and the Senate recede from its objection to the provision forbidding the transfer of title. The recommendation of the Conference

Committee was followed and the bill was passed, containing Section 2 as quoted above. The deed, pursuant to the statute, was made on June 15, 1936, and contained the provisions of the statute concerning the transfer of title and the taking of the property upon the order of the President. On June 18, three days after the execution of the deed, the City Council of the City of Charleston authorized the leasing to the plaintiff of a part of the property consisting of approximately 420 acres, at a rental of $1.00 per year for fifty years, with the right of renewal for an additional fifty years. The resolution of the Council recited that the plaintiff desired to establish a manufacturing plant on the property, and that the establishment of such a plant would be of great benefit to the community in furnishing employment, and in purchasing water from the Charleston Municipal Water System, thus providing funds to enable the city to improve its water supply facilities. On the next day, June 19, the city made its lease to the plaintiff. The lease required the plaintiff to expend not less than $5,000,-000 within two years in erecting a manufacturing plant on the leased property. Also on June 19 the City and the plaintiff made a contract under which the plaintiff was to pay the city $30,000 a year for water, for the last 44 years of its 50-year lease, and lesser amounts during the first six years. The plaintiff entered the property under its lease and spent more than $11,-000,000 in the construction of a paper mill and other improvements to the property.

On September 8, 1939, the President proclaimed a national emergency. 54 Stat. 2643. On May 27, 1941, the President proclaimed an unlimited national emergency. 55 Stat. 1647. On May 5, 1941, the President wrote a letter to the Mayor of Charleston, in which he referred to the provisions of the statute here under construction authorizing the taking of the property upon order of the President during the period of an emergency, and saying that the property was, by his letter, taken for the use of the War Department. The plaintiff was notified and delivered up possession of the

---

1. Hearings before Committee on Merchant Marine and Fisheries on S. 3789 and H. J.Res. 228, 74th Cong. 2d Sess. 1936, p. 10.

property requested. It gave up 91⅓ acres of land on which were various improvements, including docks with more than 1,500 feet of deep-water frontage, headhouses, warehouses, railroad tracks and other structures. The plaintiff was required to remove its machinery, equipment, stores, offices, and other property, and to expend money in constucting, equipping and altering structures for the relocation of its property and the , continuance of its operations. The plaintiff was excluded from all the property taken until February 1946, when it was given temporary possession of a part. All the rest of the property was returned to the plaintiff in February 1947, pursuant to a formal order of the President dated February 3, 1947.

■ Our question is whether Section 2 of the Act of May 27, 1936, quoted above, authorized the Government to take the temporary use of the property without compensation to the plaintiff. The plaintiff urges that Congress was aware that its proposed grantee, the City of Charleston, would arrange by lease or otherwise for the construction on the property of one or more industrial plants; that no enterpriser would have spent his money to construct such a plant if his possession of it would have been subject to the right of the Government to dispossess him, without compensation, in case of an emergency. This argument has much force, in the abstract, and it must have had force in Congress. As we have seen, the bill as passed by the Senate contained the provision authorizing the President to take back the property during the period of an emergency, but was silent on the question of compensation. In that posture, the natural construction of the bill might well have been, that such a taking would not require compensation. At that stage there was nothing in the legislative history, except the circumstance adverted to above, which would have indicated a contrary intent. The House of Representatives had a definite intent, and it made that intent explicit by inserting the words "without cost to the Government." Whatever may have been the Senate's original intent, its refusal to agree to the House amendment showed that it was not willing to authorize a retaking without compensation. At least it was not willing to do so explicitly. After the Conference, the House acceded to the Senate's position. We think that the intent of Congress, then, as shown by this history, was either that it intended that the Government should pay compensation, if it retook the property, or that the question of whether it should pay compensation or not should be decided, persumably by a court, without being foreclosed by an express statutory provision.

■ If Congress had the former intention, the Government is liable. And we think that if Congress had the latter and less definite intention, the Government is likewise liable. The Constitutional provision for the payment of just compensation for the taking of private property for public use seems clearly applicable unless the right to take without compensation can be spelled out of the title papers upon which the plaintiff's title is founded. But Congress was, as we have said, unwilling that the title of the City of Charleston should be so incumbered by the Act of Congress. The plaintiff became, then, the private owner of an interest in the property, and the Constitution gives it the right to.be compensated for its taking.

■ The Government urges that the plaintiff's title is defective because the City of Charleston was forbidden, by the statute and the deed to it, to make a lease for fifty years with the right in the plaintiff to renew for a similar term. We think not. The provision of section 2 of the act that the deed from the Secretary of Commerce should "include a provision prohibiting the city of Charleston from transferring the title to said property to any person, firm, or corporation", could hardly, in view of the purpose of the legislation, have been intended to prohibit the City from leasing the property for a term sufficiently long to justify industrial enterprisers in making large expenditures for the construction of plants. Congress must have intended that the City should not convey the fee to the property and thereby sever itself from all property interest in it. If the statutory provision had been inserted in a private conveyance, it would have been void, or at least would

have received the narrowest possible construction, because of its collision with the policy against restraints on alienation. Congress can, of course, make its own policy in this regard, but we think it is not improper to give the usual policy some effect in the interpretation of an ambiguous statute. Here, a construction of the statute which would have forbidden leasing would have frustrated the objective of the legislation. We think that the City of Charleston, when it, contemporaneously with the enactment of the statute, assumed that it had the right to make the lease to the plaintiff, appraised rightly the intent of Congress.

■ The Government asserts that it took the property in question under a claim that it had the right to take it without compensation, and that it cannot, therefore, be judicially required to compensate the plaintiff. It cites Tempel v. United States, 248 U.S. 121, 39 S.Ct. 56, 63 L.Ed. 162. We see nothing in the President's letter, exercising his statutory authority to take the property, which indicates that he had any thought, one way or the other, about the necessity for paying compensation for the taking. In United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206, and United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789, the Court regarded the consent of the United States to be sued upon claims "founded upon the Constitution" as independent of circumstances giving rise to a contract implied in fact.

The Government must compensate the plaintiff for the taking of its property. The amount which the plaintiff may recover has been reserved for further proceedings before a Commissioner of this Court.

JONES, C. J., and HOWELL, WHITAKER and LITTLETON, JJ., concur.