**UNITED STATES of America,
Petitioner,**

v.

**CERTAIN LANDS IN HENNEPIN COUNTY, MINNESOTA,** containing 6.06 acres, more or less; Minneapolis Gas Company, et al., Respondents.

Civ. No. 3374.

United States District Court
D. Minnesota, Fourth Division.
April 26, 1957.

Chester L. Nichols and George C. Mastor (of Nichols, Mullin, Farnand & Lee, Minneapolis, Minn.), for respondent Minneapolis Gas Co.

George E. MacKinnon, U. S. Atty., and Harold C. Evarts, Asst. U. S. Atty., St. Paul, Minn., for the United States.

NORDBYE, Chief Judge.

The United States Government instituted this action by filing a petition for condemnation on June 21, 1950, to acquire certain lands and easements for the construction of the lower lock and dam, the St. Anthony Falls Project, Minnesota, authorized by Act of August 26, 1937, 50 Stat. 848, 33 U.S.C.A. § 540. Pursuant to the request of the Secretary of the Army dated June 13, 1950, an order for immediate possession was granted on June 21, 1950. The lands were acquired in the name of the United States under the provisions of the Act of June 29, 1906, 34 Stat. 632, 33 U.S.C.A. § 592, and the Rivers and Harbors Act of July 18, 1918, 40 Stat. 911, 33 U.S.C.A. § 595. The purpose of the installation of locks and dams was to promote the navigability of the river and to enable river traffic to proceed up the river.

The Minneapolis Gas Company (hereinafter called the Gas Company) owned tracts denominated A–1, A–6, A–7 and A–8 in the petition for condemnation. The Government took a fee simple in Tract A–1 and lesser interests in the other tracts. The value of these tracts was stipulated at the pre-trial conference as being $30,617. Some three years after the institution of the condemnation proceedings, the Gas Company filed an answer, and on July 23, 1954, an amended answer, claiming that additional compensation is due it by virtue of injury to a portion of its property lying adjacent to Tract A–1. For the purposes of this proceeding, the Court need concern itself only with the taking of Tract A–1, which lay along the south bank of the Mississippi River at Minneapolis.

The character of the land adjoining the river at the point in question is such that steep banks, perhaps seventy or eighty feet high, have formed through the centuries by water erosion. At the base of the banks, however, certain parcels of land exist between the base of the bank and the water line. Tract A–1 was such a parcel. When the Gas Company owned that tract, it had constructed and utilized a pump house and settling basin thereon. The pump house and settling basin were used in connection with a production plant and storage facilities which adjoined Tract A–1, but which were situated on a piece of property above the bank which sloped down to Tract A–1. The Government did not take Tract A–1 for flowage purposes and did nothing on or to this parcel up to the time of the injury complained of.

In 1950, the Government, in connection with the construction of the lock and dam, had constructed a cofferdam on the opposite or north side of the river. This cofferdam allegedly restricted the flow of water to the southerly half or two-thirds of the river. In 1949, in pursuance of the promotion of the navigability of the river, the Government had dredged a channel immediately riverward from Tract A–1. In 1950 and 1951, the water level of the Mississippi River, by reason of natural causes, was higher than average, and in April, 1952, it reached the highest level on record or in memory. The river receded, but did so slowly and continued high into the summer months.

The strata of the earth in this area is composed of successive layers of various substances. The first layer is glacial drift or glacial over-burden. It is the loose material which is commonly referred to as soil. Its depth varies greatly. Immediately below this is a layer of limestone which varies in thickness from twenty to thirty feet. Limestone is a hard substance and provides good support. Under the limestone is a thin layer of shale; below this is sandstone. The sandstone does not erode as easily as glacial drift, but when compared with

limestone, the sandstone erodes easily when exposed to the action of water. All four of these layers were exposed along the river bank except that the sandstone was protected from erosion by varying amounts of rocks, dirt and debris which had fallen down the bank.

At least forty years ago the Gas Company constructed a revetment wall, apparently to stabilize that portion of its bank composed of glacial drift. The wall rested upon the limestone layer which substantially formed a verticle cliff along the river bank. This revetment wall was adjacent to Tract A–1. The limestone layer was, of course, supported by the shale and sandstone below it. During the high water of April, 1952, the pump house and settling basin on Tract A–1 were washed away, but a wall of the pump house remained standing which jutted into the river during the high water. Immediately upstream to the west of this wall, the sandstone portion of the bank was eroded away. This erosion undermined the bank, creating a cavern into the bank under a part of the limestone ledge which supported the Gas Company's revetment wall. On July 19, 1952, the limestone ledge, a portion of the revetment wall and land immediately behind the wall collapsed and a portion thereof caved into the river. It appears that the failure of the revetment wall has weakened and endangered the supports of other adjacent properties belonging to the Gas Company, including the land on which Gas Holder No. 3 is situated, so that a new retaining wall must be constructed to prevent further substantial damage to its property. It is for this damage that the Gas Company seeks recovery herein.

The Gas Company does not contend that the Government was negligent. Rather, it contends that the Government constructed the cofferdam on the north bank in such a manner that the main stream of the current was shunted against the south river bank. This, it claims, caused the sandstone to wash away, forming the cavern, and eliminated the support necessary to support the limestone ledge and the revetment wall. The Gas Company further contends that the pump house was substantially demolished by the force of the high water, but that a wall thereof which remained standing accentuated the erosive force of the current by preventing water from flowing freely downstream, and instead created a whirling motion of the water directed at the exposed sandstone. However, this was a minor factor, if any, in contributing to the erosion of the adjacent bank. The Gas Company also maintains that dredging the river channel contributed to the erosion of the bank. It asserts that in dredging the channel, the Government exposed sandstone on the bed of the river. It contends that the natural state of the river bed at this point is less susceptible to erosion in its natural state than in the dredged condition and that the river bed itself was deepened when the sandstone was thus exposed. As the river bed eroded, the Gas Company contends that the water infringed upon the adjoining banks and altered the natural course of the entire river.

The Gas Company admits that the high water was a substantial contributing factor to the damage it suffered, but it maintains that the collapse of its revetment wall would not have occurred but for the Government's erection of the cofferdam and the dredging operations. The Government, on the other hand, contends that the damage suffered by the Gas Company resulted primarily from the unprecedented high water and related circumstances over which the Government had no control. The Government also offered evidence to the effect that the dredging operations tended to lessen the height of the water and hence ameliorated the eroding effect of the river along the south bank. In regard to the factual situation, it is the Government's position, therefore, that the Gas Company cannot show that injury to its property was caused by the Government's activities. The parties have stipulated that, in the event the Government should be found liable, damages by reason of the collapse

of the revetment wall are substantially $80,000, in addition to the $30,617 agreed valuation of the property officially appropriated.

At the outset, the Government challenges the Court's jurisdiction in this condemnation proceeding to grant the respondent Gas Company any relief by reason of the damage to its revetment wall and adjoining property. The amount in controversy admittedly exceeds the limits of the Court's jurisdiction under the Tucker Act, 28 U.S.C.A. §§ 1346, 2401, 2402. It is recognized that the taking of Tract A–1 by the Government was for the purpose of providing an area to be used in connection with the lock construction at that point. But the Government did not take it for flowage purposes. On the contrary, the taking of Tract A–1 and its intended utilization by the Government was to build up that area by earth and rock fill, which ultimately would provide additional protection to the south bank of the river from erosion in times of high water. The Government did not perform any work or change in or on this tract which in any degree contributed to the erosion of the south bank of the river. If Tract A–1 never had been taken in condemnation by the Government in this proceeding, the full damage of which complaint now is made would have occurred notwithstanding. That is, there is not present here the question of any consequential damage to the Gas Company's property which can be attributed to the taking or use of Tract A–1. And whatever the intention of the Government may have been with reference to the use of this tract in connection with the lock and dam construction in that area, it is an indisputable fact that the taking of Tract A–1 and its use by the Government in July, 1952, and before, in no way related or contributed to the damage to the revetment wall. That is, the damage to the wall would have occurred regardless of the Government's taking and use of this tract. The evidence is clear and convincing that the high water of 1952, at least, would have flooded Tract A–1 regardless of the building of the cofferdam and the dredging of the river.

■ Here we are concerned only with that which constitutes a taking in a condemnation proceeding instituted by the United States, and generally speaking such a taking is limited to the specific appropriation of property by official government act. It is true that the concept of taking is extended to include damages as a result of severance of title caused by the taking and also includes "damages caused by the use of the property for the purpose for which the condemnation is made." United States v. Chicago, B. & Q. R. Co., 8 Cir., 82 F.2d 131, 135, 106 A.L.R. 942, certiorari denied 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1408. But here there is an absence of any use, construction, maintenance or operation on Tract A–1 which has the remotest relation to the erosion of the south bank below the revetment wall in question. The facts, therefore, are clearly distinguishable from those which were before the court in United States v. Chicago, B. & Q. R. Co., supra. Severance damage is not claimed here.

■ The respondent, however, urges that if the upper Mississippi River project had not been undertaken by the Government, then the cofferdam would not have been built and the dredging of the river would not have occurred. It urges, therefore, that the Court has jurisdiction to determine the damages resulting to any property of a party named in the condemnation proceeding, although such property has not been taken by the Government and there is no causal connection between the property taken and its use and the property damaged. This conception of the jurisdiction of the Court would do violence to the teachings of all of the well-considered cases dealing with the interpretation of "taking" in condemnation cases, and one must not be led astray by the broad interpretation of the term "taking" which may be found in some of the cases under the Tucker Act. If respondent's conception of a "taking" is sound, then in connection with the construction of this lock and dam, the taking

of an easement by the Government over respondent's lands in order to furnish ingress and egress to and from the river bank, or a taking by way of a lease of respondent's buildings on the hill above the river for storage purposes, would constitute a basis for the Court's jurisdiction in this proceeding to determine whether the Government is liable for the damages caused respondent by reason of the erosion of the south river bank. It seems elementary that respondent's position in this regard is unsound.

The respondent refers to Section 595, 33 U.S.C.A., which reads,

"* * * the jury or other tribunal awarding the just compensation or assessing the damages to the owner, whether for the value of the part taken or for any injury to the part not taken, shall take into consideration by way of reducing the amount of compensation or damages any special and direct benefits to the remainder arising from improvement and shall render their award or verdict accordingly."

Emphasis is placed upon the words "assessing the damages to the owner, whether for the value of the part taken or for any injury to the part not taken." The respondent also refers to United States v. River Rouge Improvement Company, 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339, and United States v. Nine Acres of Land, etc., D.C., 100 F.Supp. 378. But these cases do not support respondent's conception of jurisdiction in condemnation cases. Granted that the benefits as well as the damages by reason of the taking are matters for the jury to consider in a condemnation case, but it necessarily must follow that the damages are those that proximately result from the taking of the land and the use to which it is put by the Government. Respondent seeks to lay down the principle that in a condemnation case where improvements are made in the rivers of this Nation, and where in connection with either the construction, maintenance, or use of such improvements, the Government requires the taking of a part of a parcel of land lying on the shore of the river contiguous to such improvements, it shall be required to pay in said condemnation proceeding, not only just compensation for the land actually taken as disclosed by the petition in condemnation, but for any injury to the property of the condemnee not taken which occurs in the course of such construction, maintenance, or operation of said project as a whole regardless of any connection between the use of the property taken by the Government and the damages claimed to other property. But the adoption of such a broad conception of taking in a condemnation suit is not supported by the decisions to which the Court has been referred by respondent, and certainly United States v. Chicago, B. & Q. R. Co., supra, does not support such extension of the Court's jurisdiction in a condemnation suit. There, the court states, 82 F.2d 131, at page 135,

"When part of a tract is taken the damages are not limited to such as result from the mere severance of title caused by the taking, but include damages caused by the use of the property for the purpose for which the condemnation is made. [Citing cases.] Such use embraces the construction of the work or improvement and the maintenance, use and operation of the same * *."

It will be noted that the court in United States v. Chicago, B. & Q. R. Co., supra, limits the right to damages which proximately result from the *improvement, construction or use of the area taken.* United States v. Nine Acres of Land, supra, makes the same observation, 100 F.Supp., at page 379,

"It should be observed in passing that the evidence taken at the trial may show that the part of the defendant's property not taken in these proceedings *has been damaged by the use to which the part taken has been put,* in which event under 33 U.S.C.A. § 595, the defendant may be able to recover its damages." [Citing cases.] (Emphasis supplied.)

There is an absence here of any showing or even contention that the taking of Tract A–1 in any manner by any construction, work, or improvement thereon proximately in any degree contributed to this damage.

■ The cases cited by the respondent which arise under the Tucker Act and which predicate a claimant's right of recovery under the Fifth Amendment of the Constitution, or which, under the circumstances, conclude there was an implied promise on the part of the Government to pay—United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, and United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789—are not particularly helpful here in determining whether there has been a taking in this condemnation proceeding of the property adjacent to Tract A–1. This Court, in the absence of consent of the Government, has no authority to expand or enlarge the scope of an appropriation in a condemnation proceeding. It cannot assume to transform a condemnation action into an implied contract proceeding and thus erase the jurisdictional differences which exist in eminent domain proceedings and the obligation of the Government under the Tucker Act. The Eighth Circuit Court of Appeals in Boyd v. United States, 222 F.2d 493, at page 494, has again emphasized the applicable principle with reference to the necessity of the connection between the use of the property taken and the damage to the remainder, stating,

"The applicable general principles are well settled. 'Whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing * * * injury due to the use to which the part appropriated is to be devoted.' United States v. Grizzard, 219 U.S. 180, 183, 31 S.Ct. 162, 163, 55 L.Ed. 165, 31 L.R.A.,N.S., 1135. The use to which an appropriated part of a tract is to be devoted means, for purposes of any depreciating injury occasioned to its adjoining remainder, 'the uses to which the land taken may, or probably will, be put'. Sharp v. United States, 191 U.S. 341, 352, 24 S.Ct. 114, 116, 48 L.Ed. 211."

And see State Road Department of Florida v. United States, 5 Cir., 166 F.2d 843; New York Telephone Co. v. United States, 2 Cir., 136 F.2d 87. The fact that Tract A–1 was never put to any use, or intended to be put to any use by the Government which injured or depreciated the remainder of respondent's land, presents an insurmountable obstacle to the assumption of jurisdiction by this Court to determine respondent's claim for damages herein.

In view of the conclusions reached by the Court that it has no jurisdiction in this condemnation proceeding to consider respondent's claim for damages to its revetment wall and adjacent property allegedly caused by the building of the cofferdam and the dredging of the river, it necessarily follows that the Court should not attempt to indicate its conclusions as to the causal connection, if any, between the construction and dredging referred to and the collapse of the revetment wall. Moreover, the views expressed by Judge Joyce in his memorandum order of September 17, 1954, on the Government's motion to dismiss are not determinative of the questions now presented. Obviously, his consideration of the questions presented was with respect to a motion when the pleadings alone were before him. This Court, by virtue of the complete disclosure of all the facts produced at the trial, has all the pertinent data relating to its jurisdiction.

It follows from the foregoing that the Government is entitled to an order of dismissal for the reason that the Court lacks jurisdiction to entertain respondent's claim for the damages resulting by reason of the collapse of its revetment wall on the south side of the Mississippi River and the claimed resulting damage to its adjacent property.

The only compensation to which respondent is entitled is the sum of $30,617, which heretofore has been agreed upon by the parties as just compensation for the property appropriated by the Government, as noted in its petition herein.

Findings of fact and conclusions of law consistent herewith may be presented by the Government upon ten days' notice.

An exception is reserved.