MEIERHENRY, Justice,
dissenting on Issue 3.
[¶ 102.] I respectfully dissent from the majority’s conclusion that SDCL 41-9-1.1(2) is not a taking for which just compensation is due. I agree with the circuit court’s determination that this statutory provision results in a physical invasion of Landowners’ properties. As the circuit court recognized, the “right to exclude others is one of the most essential sticks in the bundle of rights that are commonly characterized as property.”
[¶ 103.] My fundamental disagreement with the majority centers on the interpretation of the statute. I would conclude that the Legislature intended to extend the road hunting easement to include shooting at birds over private land. The' extension of the easement took away Landowners’ legal right to exclude road hunters from shooting ovér and entering certain portions of their property. Under this interpretation, the statute is a taking without just compensation.
[¶ 104.] Under the majority’s interpretation, the Legislature’s only intent was to decriminalize shooting at birds over private land. According to the majority, the Legislature left intact all of a property owner’s legal rights to exclude others from entering or shooting over the land. This interpretation gives the amendment little if any meaning in regard to road hunting. It just means that criminal sanctions will not be imposed by GFP. It also means that the property owners have the absolute right to deny any entry upon their land. Consequently, the property owner may have actually gained an advantage. The culprits now are' the road hunters who invade the land without permission. Conceivably the holding of the majority would also apply to the unarmed retrieval statute. The unarmed retrieval statute provides:
Unarmed retrieval of lawfully taken small game from either private land or land controlled by the Department of Game, Fish and Parks, or other public lands, is not a crime or petty offense, if the retrieval of the small game does not involve the use of a motor vehicle.
SDCL 41-9-8 (emphasis added). Since property owners retain all' rights ■ to exclude others from their land, they would also have the right to deny unarmed retrieval of birds legally shot from the roadway because, like SDCL 41-9-1.1(2), the unarmed retrieval' statute “decriminalizes,” rather than authorizes, retrieval.
[¶ 105.] There is no doubt that the days of private property owners giving strangers permission to hunt without charge have all but disappeared. Property owners, instead, have transformed hunting into an industry that serves to supplement their farm income. They have turned their farmland into commercial hunting preserves. Investment in hunting preserves involves land and crop management specifically designéd to complement game' preservation- and hunting rather than crop yield. Hunting preserve owners must obtain a state permit, pay 'an annual license fee, and abide by GFP regulations. ■ SDCL 41-10-2; SDCL 41-10-4; see generally SDCL ch. 41-10. In addition, preserve owners must' purchase -and release large numbers of domestically raised birds to augment the native hatch. ARSD 41:09:01:02 (requiring preserves to release and- maintain at least 600 male pheasants). The resulting abundance of birds in and around the preserves naturally attracts road hunters. Today’s opinion, however, appears to diminish the range of road *166 hunting since the road hunters have no right to shoot over private property or gain entry without the property owners’ authorization.
[¶ 106.] Thus, unauthorized road hunters could face civil liability. The majority leaves open all civil remedies to the property owners’ creativity and devices. Is this what the Legislature really intended by the amendment? Did the Legislature envision property owners clearly posting their land with warnings that any and all trespass is prohibited and that violators would be civilly liable? Was the expectation that hunters who shoot birds over private land could find themselves liable for damages, perhaps at least in amounts similar to or more than what they would have paid had they been paying guests? If so, GFP needs to update its hunting manual to alert road hunters of their potential civil liability whenever they breach private land and airspace by gunshot or physical entry.
[¶ 107.] I cannot agree that this is what the Legislature intended. It is more likely that the Legislature intended to expand the definition of road hunting to include shooting over “private land.” The intent can be determined from the plain and ordinary meaning of the language of the statute. The precise statutory language defines “hunting on highways or other public rights-of-way” as including:
(1) The shooting at or taking by legal methods of small game, except mourning dove, that are located within the boundaries of the highway or public right-of-way;
(2) The shooting at or taking by legal methods of small game, except mourning dove, that are in flight over private land if the small game has either originated from or has taken flight from the highway or public right-of-way or if the small game is in the process of flying over the highway or public right-of-way.
SDCL 41-9-1.1 (emphasis added). The statute authorizes members of the public who are hunting on public highways or rights-of-way to fire at birds that either fly up in rights-of-way or merely fly over rights-of-way, but continue in flight over private land. Thus, the meaning is clear.
[¶ 108.] But if there is some ambiguity, the circumstances surrounding the 2003 amendment of SDCL 41-9-1.1 support this interpretation. First, the change in the definition of “hunting on public rights-of-way” was intended to abrogate our decision in State v. Rumpca so as to allow the public to shoot birds over private property. See 2002 SD 124, 652 N.W.2d 795. Dissatisfied with the limits on road hunting enunciated in Rumpca, hunters and the organizations representing them turned to the Legislature with demands for more available public hunting. The State can— and does — establish publicly owned parcels of land on which its citizens may hunt. In comparison with other states, however, South Dakota maintains very little public hunting land. See Vincent Michael Roche, Road Hunting Shot Down: Reflecting on the South Dakota Supreme Court’s Decision in State v. Rumpca, 7 Great Plains Nat. Resources J. 31, 37 (2003). Instead of purchasing more public land to address the demand, the Legislature expanded the public easement to reach beyond the roadway, over the property line, and onto the individual property owner’s land.
[¶ 109.] Although we have not traditionally relied on legislative floor debates in determining legislative intent, it is interesting to note that nowhere in the debates was the subject of decriminalization mentioned. See Debates Concerning HB 1163, 2003 Legislative Session, available at http://legis.state.sd.us/sessions/2003/ *167 1163.htm (last visited January 23, 2006). Further, if the Legislature intended to merely affirm the private property owners’ right, to exclude road hunters altogether;, why did the Legislature provide for automatic repeal if the statute was found to be a taking? The automatic repeal provides: “If [SDCL 41-9-1.1(2) ] is declared by an advisory opinion or adjudication of the South Dakota Supreme Court to be a taking of private property requiring compensation, subdivision (2) is void.” SDCL 41-9-1.1. Based on the plain language as well as the background of the statute, I would conclude that the underlying intent of the statute was to expand the definition of road hunting to include shooting at birds that fly from the roadway onto private land, and that the State effectively enlarged the hunting easement to include the depth of shot over private property. The effect of the amendment takes away the property owners’ right to exclude road hunters from invading their property and the airspace above it. Because of the amendment, the extent of the hunting easement is now the distance gunshot can travel from the roadway easement onto the land.
[¶ 110.] With this interpretation, the question then becomes whether the State’s action of extending the hunting easement amounts to an unconstitutional taking without compensation. The first inquiry under a takings analysis is whether the action is a per se physical taking, that is, a permanent physical' occupation or intrusion of property and the airspace above it. Lingle, 544 U.S. at -, 125 S.Ct. at 2082, 2087, 161 L.Ed.2d 876; Gausby, 328 U.S. at 264-65, 66 S.Ct. at 1067-68, 90 L.Ed. 1206 (recognizing that a property owner owns the airspace above the land and because continuous invasions of airspace “affect the use of the surface of the land itself,” such invasions of airspace ■ “are in the same category as invasions of the surface” and may also be a taking). The controlling principles governing such a per se physical taking were established by Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), and Loretto, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868. See Lingle, 544 U.S. at -, 125 S.Ct. at 2082, 2087, 161 L.Ed.2d 876.
. [¶ 111.] In Kaiser Aetna, the United States, Supreme Court recognized that government cannot compel public access to private property without just compensation. Id. at 179-80, 100 S.Ct. at 393, 62 L.Ed.2d 332 (holding that government imposition of a navigational servitude on a marina created and rendered navigable at private expense, required compensation). In doing so, the Court recognized -that “the ‘right to exclude,’ so universally held to be a fundamental element of the property right,” is .an interest which “the Government cannot take without compensation.” Id. at 179-80, 100 S.Ct. at 393, 62 L.Ed.2d 332. The Court again acknowledged that principle in Loretto when it defined “[property rights in a physical thing .... as the rights ‘to possess, use and dispose of it.’’ ” 458 U.S. at 435, 102 S.Ct. at 3176, 73 L.Ed.2d 868 (citation omitted). The Court further recognized that “[t]he power to exclude has traditionally been considered one of-the most'treasured strands in an owner’s bundle of property rights.” Id. In addition, “[a] permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a- party authorized by the State, is the occupant.” Id. at 432 n. 9, 102 S.Ct. at 3174 n. 9, 73 L.Ed.2d 868.
[¶ 112.]. Likewise, a physical invasion of property may be a taking even if the government’s dominion over private property is only partial or temporary in nature. As the Court of Appeals for the Federal Circuit has explained,
*168 [A] permanent occupation need not exclude the property owner to be compen-sable as a taking. See, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 436-88, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that a compulsory installation of cables on apartment buildings pursuant to a state statute constituted a taking). Nor must the occupation be continuous. Thus, for purposes of takings analysis, “a ‘permanent physical occupation’ has occurred ... where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself' permanently upon the premises.” Nollan v. Cal. Coastal Comm’n, 483 U.S. 825, 831-32, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).
Ridge Line, Inc., 346 F.3d at 1352 (considering a claim that the- federal government took a flowage easement by increasing runoff on the plaintiffs property and finding that circuit court erred in requiring proof that the plaintiffs property was effectually destroyed or that it suffered a permanent and exclusive government occupation which destroyed its right to possession); see also United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) (affirming a lower court’s finding that the federal government took -an easement by inverse condemnation when its dam caused intermittent flooding).
[¶ 113.] In this case, SDCL 41-9-1.1(2) allows the State to exercise dominion and control over Landowners’ property. Under that dominion, the State gives hunters a permanent and continuous right to invade Landowners’ property during hunting season. Just as intermittent flooding may be a taking, so may the seasonal appropriation of Landowners’ property by the State in a manner which completely deprives them of their right to exclude. The effect of SDCL 41-9-1.1(2) is to require Landowners, year after year, to submit the use of their land to the State, which appropriates the benefit of the property to the public under terms the State establishes. Because of the statutory provision, Landowners are permanently deprived of a fund&mental property right — the right to exclude. An after-the-fact civil suit cannot suffice where the State’s action “does not simply take a single ‘strand’ from the ‘bundle’ of property rights: it chops through the bundle, taking a slice of every strand.” Loretto, 458 U.S. at 435, 102 S.Ct. at 3176, 73 L.Ed.2d 868.
[¶ 114.] Because SDCL 41-9-1.1(2) constitutes a per se physical taking, the regulatory takings analysis under the factors set forth in Penn Central Transportation Co., 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, does not apply. See Lingle, 544 U.S. at -,-, 125 S.Ct. at 2082, 2087, 161 L.Ed.2d at 888, 894. Here, the State is not “exercising its regulatory power in a manner that will cause an insubstantial devaluation of [Landowners]’ property.” Kaiser Aetna, 444 U.S. at 180, 100 S.Ct. at 393, 62 L.Ed.2d 332. Rather, SDCL 41-9-1.1(2) imposes, a servitude, which “in this context will result in an actual physical invasion of the privately owned [land].” Id. As recently reiterated by the United States Supreme Court, a permanent physical invasion, however minor the economic cost, constitutes a per se taking because it “eviscerates the owner’s right to exclude others from entering and using her property — perhaps the most fundamental of all property interests.” Lin-gle, 544 U.S. at —, 125 S.Ct. at 2082, 161 L.Ed.2d at 888. The amendment to SDCL 41-9-1.1 subjects property owners to continual invasions of their airspace and their property abutting public rights-of-way during hunting season, and it deprives them of a fundamental property interest: *169 the right to exclude. The intrusion suffered by Landowners may be minimal, but that fact bears only on the appropriate amount of damages, a question of fact. Loretto, 458 U.S. at 438, 102 S.Ct. at 3177, 73 L.Ed.2d 868 (“Once the fact of occupation is shown ... a court should consider the extent of the occupation as one relevant factor in determining the compensation due.”).
[¶ 115.] The straightforward legislative scheme involves expanding the definition of road hunting to include shooting a bird over private property from a public right-of-way easement. The Legislature explicitly expanded the easement to include private property. When it did so, it demanded that Landowners subject a portion of their property for use by the public and took away their right to exclude. Such is constitutionally prohibited without compensation. Therefore, I would affirm the circuit court’s holding that SDCL 41-9-1.1(2) is an unconstitutional taking of private property without just compensation and thus void, as directed by the legislation.
[¶ 116.] Affirmed in part and reversed in part.
[¶ 117.] GILBERTSON, Chief Justice, KONENKAMP and ZINTER, Justices, and JOHNSON, Circuit Court Judge, concur on Issue 1.
[¶ 118.] GILBERTSON, Chief Justice, KONENKAMP, Justice and JOHNSON, Circuit Court Judge, concur on Issue 2.
[¶ 119.] ZINTER, Justice, concurs specially on Issue 2.
[¶ 120.] ZINTER, Justice, and JOHNSON, Circuit Court Judge, concur on Issue 3.
[¶ 121.] KONENKAMP, Justice, concurs in result on Issue 3.
[¶ 122.] MEIERHENRY, Justice, dissents on Issue 3.
[¶ 123.] JOHNSON, Circuit Court Judge, sitting for SABERS, Justice, disqualified.