*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

JENNIFER JANSSEN-ROGERS, and BROOKE
ROSENBAUM,

        Plaintiffs-Appellees,

v

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY, and ERIC OSWALD,

        Defendants-Appellants.

UNPUBLISHED
January 29, 2026
9:20 AM

No. 369025
Court of Claims
LC No. 21-000246-MM

---

DARETHA BRAZIEL, Individually and as Next
Friend of RB, DB, and DR, Minors, KEESHA
JONES, Individually and as Next Friend of KJ, DJ,
TMC, TC, and KB, Minors, IEASHA JONES,
MICHAEL D. BRIGHAM, REBECCA
BRANSCUMB, STACEY BRANSCUMB, and
EMMA KINNARD,

        Plaintiffs-Appellees,

v

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY, ERIC OSWALD,
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, and DIRECTOR OF DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

        Defendants-Appellants.

No. 369026
Court of Claims
LC No. 22-000046-MM

---

OLIVER KAVANAUGH, Individually and as Next
Friend of KNR, Minor,

v

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY, and ERIC OSWALD,

Defendants-Appellants.

No. 369027
Court of Claims
LC No. 22-000050-MM

Before: KOROBKIN, P.J., and MURRAY and MALDONADO, JJ.

MURRAY, J. (*concurring in part and dissenting in part*).

I concur with the majority's conclusion that defendants' motion for summary disposition was properly denied because the evidence failed to eliminate questions of fact regarding whether defendants' fraudulent concealment tolled the claim of injury to bodily integrity under Const 1963, art 1, § 17. However, the trial court order denying defendants' motion as to the inverse condemnation claim under Const 1963, art 10, § 2, should be reversed as that claim accrued more than six-months before the filing of any of the complaints, and therefore was barred under MCL 600.6431(4).

Private property "shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." Const 1963, art 10, § 2. Plaintiffs do not allege that defendants physically took their property by condemnation, eminent domain or tax foreclosure. Instead, they allege government action caused a diminution in their property values. "Inverse condemnation can occur without a physical taking of the property; a diminution in the value of the property or a partial destruction can constitute a taking." *Mays v Governor*, 506 Mich 157, 173; 954 NW2d 139 (2020) (quotation marks and citation omitted) (*Mays II*) (opinion by BERNSTEIN, J.).

> Government actions directed at a plaintiff's property must have the effect of limiting the use of the property. [A]ll of the [defendants'] actions in the aggregate, as opposed to just one incident, must be analyzed to determine the extent of the taking. A plaintiff must establish (1) that the government's actions were a substantial cause of the decline of the property's value and (2) that the government abused its powers in affirmative actions directly aimed at the property. [*Id*. at 173-174 (quotation marks and citations omitted).]

Accord *Merkur Steel Supply, Inc v Detroit*, 261 Mich App 116, 125; 680 NW2d 485 (2004).

There is a six-month deadline to file a claim "against this state for property damage or personal injuries[.]" MCL 600.6431(4). A claim "accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." MCL 600.5827. Determining the accrual date "requires us to determine when plaintiffs were first harmed." *Mays II*, 506 Mich at 182 (opinion by BERNSTEIN, J.). "The precise point in time when the running of

-2-

the limitation period is triggered is determined by the facts and circumstances of each case." *Hart v Detroit*, 416 Mich 488, 504; 331 NW2d 438 (1982).

Plaintiffs alleged the private water service lines running into their respective properties contained lead from the City's service lines, resulting in physical damage to those properties and causing their value to decrease. Specifically, in their complaint plaintiffs allege that the damage to their property was "caused by the physical invasion of corrosive, lead-contaminated water into their properties, which were rendered and remain unsafe and unfit for ordinary use." This allegation places this matter in line with *Henry v Dow Chem Co*, 501 Mich 965; 905 NW2d 601 (2018), where the Court held that claims based on dioxins leaking onto the plaintiffs' properties accrued when the leaching first occurred:

> The wrong is done when the plaintiff is harmed. As explained by dissenting Judge Gadola, the claimed harm to the plaintiffs in this case is the presence of dioxin in the soil of their properties. The period of limitations began to run from the date that this "wrong" occurred. The circuit court must therefore determine the accrual date of the plaintiffs' claims based on the occurrence of the wrong—the presence of dioxin on the plaintiffs' properties. [Citation omitted.]

In light of this, plaintiffs' inverse condemnation claims accrued at the time that corrosive and contaminated water entered the affected properties. This holds true even if the scope of damages arising from the harm to the properties increased later. See also *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 290; 769 NW2d 234 (2009) ("Later damages may result, but they give rise to no new cause of action, nor does the statute of limitations begin to run anew as each item of damage is incurred.") (quotation marks and citation omitted).

This also holds true even if the market value of affected homes did not immediately drop once the water entered the homes. And, to that point, plaintiffs allege that the water "impaired the value, marketability, and ordinary use of" plaintiffs' properties. According to *Mays v Snyder*, 323 Mich App 1, 29; 916 NW2d 227 (2018), aff'd 506 Mich 157 (2020), this type of claim accrues once the homes' value decreases, which is "when the water crisis became public and marketability . . . became significantly impaired . . . ." The Supreme Court likewise focused on when objectively a plaintiff should know the lead caused a diminution in value, observing that the plaintiffs' property damage "could not have occurred on the date the water source was switched," but instead "diminished in value at a later date . . . when a buyer or bank had the requisite information to be disinclined to buy or finance the purchase of property in Flint." *Mays II*, 506 Mich at 184 (opinion by BERNSTEIN, J.).

Here, there is no dispute that the public was informed since 2018 that lead surpassing permissible federal levels had entered the pipes of affected homes. The record is undisputed that, beginning in 2018 and continuing for many years, action-level exceedance (ALE) notices were issued about the excessive lead levels, public meetings and hearings were repeatedly held on the issue, and there was vast media coverage of the lead issue in general, and of the public forums. Thus, very much unlike the situation in *Mays*, 323 Mich App at 65, where the plaintiffs alleged a complete cover-up of the high levels of lead entering Flint homes, here there was widespread notice and coverage about the ALEs (and attempts to remedy the problems), all of which put the public

(banks and prospective home purchasers) on notice about the lead water entering the pipes in certain Benton Harbor homes.

Although plaintiffs may not have had a reason to know the water could cause bodily injury until 2021, because much of that is dependent on how much lead a person is exposed to, and other individualized concerns as to how a person's body reacts (if at all) to the lead, this does not hold true for the inverse condemnation claim. As of the time of the first ALE in 2018, plaintiffs knew or should have known that the service lines were damaged to some degree by lead, as it was publicly disclosed that the lead was in the pipes of affected homes, and that it was continuing to occur. With this publicly disclosed information, there can be no reasonable dispute that, as of that time, the values of the subject properties were diminished in the eyes of banks and prospective purchasers. See *Mays II*, 506 Mich at 173 (opinion by BERNSTEIN, J.). Again, plaintiffs do not dispute that the evidence shows repeated news releases, public meetings, and formal notices (all of which received media coverage) about the excessive lead in the water entering homes, and that the problem was a continuing one. The entry of this water into the homes, as well as its presence in the water system in general, would diminish the value of any affected home. And this was all true years before any filing from plaintiffs.

In a supplemental brief, plaintiffs for the first time cite *Hart* for the proposition that the City committed a continuous wrong under the stabilization doctrine, and that the inverse condemnation claim accrued only when defendants' actions stabilized. According to plaintiffs, an expert analysis is required to determine when the diminution in property values occurred and any diminution in 2018 was insufficient to trigger accrual.

In *Hart*, the Court stated that "[t]he time of taking in an inverse condemnation action is not necessarily coincidental with the time plaintiff's cause of action accrues." *Hart*, 416 Mich at 503-504 (quotation marks and citations omitted). Rather, when an action "involve[s] a continuous wrong by the condemnor rather than a single act," then "the statute of limitations does not begin to run until the consequences of the condemnor's actions have stabilized." *Id*. at 504. Specifically, in *Hart*, *id*. at 493, Detroit tore down structures in a neighborhood before it acquired the subject properties for nonpayment of taxes or initiated condemnation proceedings. Noting that there was a stipulation by the parties regarding a "de facto taking of the property prior to the date of the tax sales," the Court held that it was "for the trier of fact to determine whether a continuous wrong was involved here and, if so, when the consequences of this wrong had stabilized, thus triggering the statute of limitations." *Id*. at 504.

Initially, it is noteworthy that the *Mays II* Court did not analyze *Hart* or rely on the stabilization doctrine when analyzing the inverse condemnation claim. *Mays II*, 506 Mich at 172-180 (opinion by BERNSTEIN, J.). More importantly, the stabilization doctrine originated in a case involving a flood, *United States v Dickinson*, 331 US 745, 748-751; 67 S Ct 1382; 91 L Ed 1789 (1947), where the construction of a dam caused a river's water level to rise in "successive stages," and resulted in permanent flooding of "the land belonging to the respondents." *Id*. at 746-747. Addressing when the inverse condemnation claim accrued, *id*., the Court stated that the claim was continuous, as opposed to "a single event," because it involved "the overflow due to rises in the level of the river." *Id*. at 749. Consequently, the plaintiffs were "not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.' " *Id*. *Dickinson* was a "limited holding," *United States v Dow*, 357 US 17, 27; 78 S Ct 1039; 2 L Ed

2d 1109 (1958), and rightly so, as that case dealt with a rising flood level, and with each incremental rise in water level, more land would be overtaken. Here, however, unlawful levels of lead flowed into these homes starting in 2018, and even if the levels varied over time, the point in this case, and for this claim, is that the harm occurred at that time and the public was aware of the unlawful levels.

For these same reasons, there was no factual dispute about any alleged fraudulent concealment of the fact that the service lines themselves contained an actionable level of lead. The fraudulent-concealment exception under MCL 600.5855, if applicable, may "toll the statutory notice period as well as the statutory limitations period." *Mays*, 323 Mich App at 43-44. There is no fraudulent concealment when the cause of action is known, and "a party will be held to know what [he or she] ought to know . . . by the exercise of ordinary diligence . . . ." *Doe v Roman Catholic Archbishop of the Archdiocese of Detroit*, 264 Mich App 632, 646-647; 692 NW2d 398 (2004) (quotation marks and citation omitted). Again, beginning in late 2018, the City advised its residents and the general public about the ALE, and continued to do so at least each time a new ALE was issued, and this public information should have made plaintiffs aware that their homes had lead-contaminated service lines, which could devalue the home. See *id*.[1]

For these reasons, the order denying defendants' motion for summary disposition, to the extent it denied summary disposition of plaintiffs' inverse condemnation claim, should be reversed.

/s/ Christopher M. Murray

---

[1] Plaintiffs argue that the first ALE was insufficient to trigger accrual, citing *Bevan v Brandon Twp*, 438 Mich 385, 402-403; 475 NW2d 37 (1991), for the proposition that "a mere diminution in property value which results from regulation does not amount to a taking[.]" However, the *Bevan* Court was referencing *Penn Central Transp Co v New York City*, 438 US 104, 131; 98 S Ct 2646; 57 L Ed 2d 631 (1978), which involved a regulatory taking. "A categorical taking occurs when there has been a physical invasion of a landowner's property or when a regulatory taking has deprived an owner of *all* economically and beneficial use of the land." *Gym 24/7 Fitness, LLC v Michigan*, 341 Mich App 238, 260; 989 NW2d 844 (2022) (quotation marks and citations omitted). Although a claim of inverse condemnation "may be based upon the government's regulatory taking of private property," *id*. at 261 (quotation marks and citation omitted), there is no regulation at issue here. Moreover, even if the first ALE was insufficient to cause a diminution in value, no reasonable juror could conclude that the subsequent notices, public meetings and media coverage of the lead water problem resulted in diminished property values well before October 2021.