Albert JULIANO and Judene Juliano, Plaintiffs,

v.

MONTGOMERY–OTSEGO–SCHOHARIE SOLID WASTE MANAGEMENT AUTHORITY, Montgomery County, Otsego County, and Schoharie County, Defendants.

No. 96–CV–1615.

United States District Court, N.D. New York.

Nov. 3, 1997.

Law Office of Rodney Salvati (Rodney Salvati, of counsel), Mount Kisco, NY, for Plaintiffs.

Grossman Kinney Dwyer & Harrigan (James Dwyer, of counsel), East Syracuse, NY, for defendant Montgomery–Otsego–Schoharie Solid Waste Management Authority.

Otsego County Attorney (James Konstanty, of counsel), Cooperstown, NY, for defendants Montgomery County, Otsego County, and Schoharie County.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

This is essentially a takings case. Plaintiffs Albert and Judene Juliano own 166 acres in the Town of Charleston, Montgomery County, New York. Although Plaintiffs reside elsewhere, they purchased the 166 acres in 1987 with the stated intent of operating a shooting and hunting club.

Defendant Montgomery–Otsego–Schoharie Solid Waste Management Authority ("MOSA") is a New York Public Authority created to establish a solid waste management facility within Montgomery, Otsego, and Schoharie Counties. MOSA's powers include the power to condemn any real property within its area of operation in order to establish the siting of a solid waste facility. In February, 1992, MOSA identified fourteen

preliminary siting areas. On April 10, 1992, MOSA contacted each of the owners of the fourteen parcels, including Plaintiffs, to obtain permission for a visual site inspection. Plaintiffs granted permission for the inspection on April 21, 1992.

After inspecting the fourteen preliminary sites, Site "G", which included Plaintiffs' property, was identified as one of three primary sites for further field investigation. On September 28, 1992, MOSA and Plaintiffs entered into an agreement ("Testing Agreement") where in consideration of the sum of $1,000 Plaintiffs consented to the entry and testing of their premises.[1]

MOSA began testing in October, 1992. The testing included excavation of test pits, drilling and sampling of borings, installation of monitoring wells and piezometers, surface and bore hole geophysical survey, hydraulic conductivity testing, and pumping tests. Testing continued until at least May, 1995, and MOSA concedes that 24 monitoring wells and 8 piezometers remain on the property.[2] These well and meter casings are four inches in diameter and extend 2 to 3 feet above the ground.

MOSA states that it has not made a decision whether to proceed with development of Site G for a regional sanitary landfill to service its three county service area. MOSA avers that a decision whether to proceed will be made in 1997, and if the project goes forward, the Juliano premises will be acquired by the state under New York's Eminent Domain Procedure Law and Plaintiffs will be compensated. Alternatively, if MOSA decides to abandon the project, it concedes that it will be obligated to compensate Plaintiffs for any damage to their property as required by the Testing Agreement.

Defendants MOSA and the individual counties seek summary judgment for the following reasons:

(1) The individual counties have no legal duty under the Public Authorities Law for the actions of MOSA.

(2) MOSA has not effectuated a permanent taking.

(3) Plaintiffs have not exhausted their required state remedies.

On September 26, 1997, in a decision rendered from the bench after oral argument, the Court dismissed Plaintiffs' Complaint as to Montgomery County, Otsego County, and Schoharie County. Accordingly, only MOSA remains.

## II. DISCUSSION

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). It is the substantive law that will determine what facts are material to the outcome of a case. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511–2512.

Initially, the moving party has the burden of informing the court of the basis of its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court must then resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–1356, 89 L.Ed.2d 538 (1986). However, the non-moving party must do more than simply show "that there is some metaphysical doubt as to the materi-

---

1. Plaintiffs argue that they were coerced into signing the Testing Agreement because MOSA made it clear that if they did not sign, they would be compelled by law to let MOSA test anyway. The Testing Agreement itself provides for mandatory arbitration, but Plaintiffs have made no claims for recision or damages under the agreement.

2. According to the site map provided by MOSA, all of the wells and meters are located on the far western portion of the property, on the other side of a creek from Plaintiffs' buildings and improvements.

al facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Only when the Court concludes that no rational finder of fact can find in favor of the non-moving party should summary judgment be granted. *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994).

## A. MOSA's Taking

Although Plaintiffs have labeled the present action using the generic term "inverse condemnation," the Court actually sees two takings issues in the facts of this case. The first issue is whether the 24 monitoring wells and 8 piezometers remaining on Plaintiffs' property constitute a "permanent physical occupation" requiring just compensation. The second issue is whether MOSA's designation of Plaintiffs' property as a potential site for a proposed sanitary landfill constitutes a regulatory taking requiring just compensation.[3]

 Before the Court can address either aspect of Plaintiffs' takings claim we must first determine whether these questions are ripe for federal court review. The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction. *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 58, n. 18, 113 S.Ct. 2485, 2496, n. 18, 125 L.Ed.2d 38 (1993). In *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court set forth a two-pronged test for assessing the ripeness of takings-type claims. The first prong requires the government entity charged with enforcing the regulations at issue to have rendered a "final decision." *Williamson,* at 185–186, 105 S.Ct. at 3116. The second prong requires the plaintiff to have sought compensation if the state pro-

vides a "reasonable, certain and adequate provision for obtaining compensation." *Id.* at 194, 105 S.Ct. at 3120 (*quoting Blanchette v. Connecticut General Ins. Corps.,* 419 U.S. 102, 124–125, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974)).

 Here, under the physical occupation theory of takings liability Plaintiffs have met both prongs of the ripeness test. First, an alleged physical taking is by definition a final decision for the purpose of satisfying *Williamson's* first requirement. *See, e.g., McKenzie v. City of White Hall,* 112 F.3d 313, 316 (8th Cir.1997). As to the second prong of the *Williamson* test, there is no evidence in the record that New York provides a "reasonable, certain and adequate provision for obtaining compensation" for the physical occupation of Plaintiffs' land. Although MOSA argues that New York's Eminent Domain Procedure Law provides a mechanism for challenging condemnation proceedings, MOSA itself concedes that a condemnation proceeding is a necessary prerequisite for such a challenge. (MOSA's Mem. of Law at 10 n. 1). Because Plaintiffs are seeking compensation for MOSA's physical occupation of their property, rather than challenging a condemnation proceeding that has not occurred, and may never occur, they presently have no state remedy and thus this action is ripe for judicial review.

 As to Plaintiffs' regulatory takings claim, however, no final decision has been rendered. *Cf. Littman v. Gimello,* 115 N.J. 154, 557 A.2d 314, 317, *cert. denied,* 493 U.S. 934, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989) (rejecting property owners claim that "the identification of their property for a hazardous waste incinerator . . . has created a 'yellow cloud' that hangs over their property and has denied them all beneficial use of the

---

**3.** Although all takings law is based on the Takings Clause of the Fifth Amendment of United States Constitution, *see* U.S. Const. amend. V. ("nor shall private property be taken for public use without just compensation"), takings jurisprudence has developed two distinct theories of liability: physical occupations and regulatory takings. The authors of the Takings Clause probably had in mind only one type of taking, the formal exercise of the power of eminent domain by government to take land for public projects.

*See, e.g.,* MORTON J. HORWITZ, THE TRANSFORMATION OF AMERICAN LAW, 1780–1860, at 63–64 (1992). With the rise of the regulatory state, however, courts began to recognize that the government could "take" property without actually physically occupying it. *See, e.g., Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 414–15, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922) ("To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it.").

land"). Pursuant to MOSA's search for a suitable landfill site, Plaintiffs' property was initially designated as a preliminary site and now as a primary site. According to MOSA, a decision has not been made whether to utilize Plaintiffs' property, or even to build a sanitary landfill within the three-county area.

Just this past term, the Supreme Court reiterated the importance of determining the ripeness of a takings claim, noting that

> [t]he first requirement follows from the principle that only a regulation that "goes too far," results in a taking under the Fifth Amendment. The second hurdle stems from the Fifth Amendment's proviso that only takings without "just compensation" infringe that Amendment; "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."

*Suitum v. Tahoe Regional Planning Agency,* — U.S. —, —, 117 S.Ct. 1659, 1665, 137 L.Ed.2d 980 (1997) (citations omitted).

If the Court were to find Plaintiffs' regulatory takings claim—i.e., MOSA's designation of Plaintiffs' property as a potential site for a proposed sanitary landfill—ripe for judicial review, every propertyholder in the fourteen preliminary siting areas could sue MOSA for the alleged diminution in property value resulting from the possibility that the property might ultimately be acquired by MOSA for use as a landfill. This is far too speculative. In addition to the important policy implications of opening the courthouse doors to this flood of potential litigants, certain practical concerns also caution against a finding of ripeness. As the Second Circuit stated in *Southview Associates, Ltd. v. Bongartz,* 980 F.2d 84 (2d Cir.1992):

Without such a final decision, a court cannot determine adequately the economic loss—a central factor in the inquiry—occasioned by the application of the regulatory restrictions. Unless a final decision has been rendered, it remains unclear just how far the regulation goes.

980 F.2d at 96 (citing, e.g., *Williamson,* 473 U.S. at 198–199, 105 S.Ct. at 3123). Accordingly, Plaintiffs' takings claim premised on a regulatory takings theory of liability must be dismissed.

### i. Permanent Physical Occupations

■ If a government has committed or authorized a permanent physical occupation of property, "the Takings Clause generally requires compensation." *Yee v. City of Escondido,* 503 U.S. 519, 522, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992). Moreover, if government action constitutes a permanent physical occupation of property, there is "a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 434–435, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982). This type of taking, requiring courts to apply a *per se* rule, has been termed a "physical taking," and stands in contrast to the fact-intensive balancing accompanying a judicial determination of whether a "regulatory taking" has occurred. *See, e.g., Penn Central Transportation v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).[4]

In *Loretto v. Teleprompter Manhattan CATV Corp.,* the Supreme Court reviewed a New York law that required a landlord to permit a cable company to install cable equipment on his building. The Court held that the permanent cable installation on the landlord's building was a permanent appro-

---

4. In *Penn Central,* the owner of Grand Central Station in New York City planned to build a fifty-three story office building above the station, while leaving the station itself intact and unaltered. When Penn Central sought city approval it was denied; the denial was not based on zoning ordinances, but on a statute permitting the city to preserve the character of historic structures. *Penn Central,* 438 U.S. at 104, 98 S.Ct. at 2649. Penn Central claimed a regulatory taking, but the Court disagreed. The *Penn Central* majority stated that in order for a court to determine whether a regulation goes "too far," three factors are balanced: (1) the character of the governmental action, (2) the economic impact of the action on the claimant, and (3) the extent to which the regulation interferes with the claimant's distinct investment-backed expectations. 438 U.S. at 124, 98 S.Ct. at 2659.

priation of a portion of the landlord's property, and thus constituted a physical taking even though it displaced only approximately one-half of a cubic foot of property. *Loretto,* 458 U.S. at 437–438 & n. 16, 102 S.Ct. at 3177 & n. 16. The *Loretto* Court explained that a permanent physical occupation occurs when government action *permanently destroys* the three rights associated with the ownership of property: the power to possess, to use, and to dispose. *Loretto,* 458 U.S. at 434–435, 102 S.Ct. at 3175. The Court added that absolute exclusivity of the occupation, and absolute deprivation of the owner's right to use and exclude others from the property, are hallmarks of a physical taking. *Loretto,* 458 U.S. at 436 n. 12, 102 S.Ct. at 3176 n. 12.

The Second Circuit had cause to apply the *Loretto* standard in *Southview Associates, Ltd. v. Bongartz,* 980 F.2d at 84. Judge Oakes restated the test for a physical occupation as follows:

> First, the government (or government authorized) action must deprive the owner of both his right to possess the occupied area and his right to exclude the occupier from possession and use of it. Second, the government action must "forever den[y] the owner any power to control the use of the property," such that he "can make no nonpossessory use" of it. Third, the government action generally leaves the owner with only "the bare legal right to dispose of the occupied space," because the occupier ordinarily renders that right worthless, and "the purchaser will also be unable to make any use of the property."

*Southview Associates,* 980 F.2d at 95 (citations omitted).

■ In summary, where the governmental action constitutes a "permanent physical occupation," a *per se* taking exists. *See, e.g.,* *Loretto,* 458 U.S. at 433–434, 102 S.Ct. at 3175. Conversely, where the governmental action is not physical and permanent, a multifactor balancing test is used to determine if compensation is required. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). Takings jurisprudence has thus evolved into two distinct branches that purport to protect the same right but use tests that share virtually no common elements.[5] However, by abandoning the multi-factor balancing test in favor of a *per se* rule, the physical occupation branch of takings jurisprudence has overlooked an important subspecies of physical takings: the temporary physical taking. Unfortunately, this appears to be precisely the issue presented here.

■ Returning to the facts here, there is little doubt that Plaintiffs have presented sufficient evidence as to the first and third requirements for showing a permanent physical occupation: MOSA's activities deprive them of the right to possess and exclude; and, a purchaser will also be unable to make any use of the occupied space. Twenty-four monitoring wells and eight piezometers remain on the property. These well and meter casings are four inches in diameter and extend two to three feet above the ground. Although the amount of space occupied by MOSA is arguably minimal, the *Loretto* court stated that permanent physical occupations are takings "even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land." 458 U.S. at 430, 102 S.Ct. at 3173.

However, the second requirement, that the government action must "forever den[y] the owner any power to control the use of the property," *see Southview Associates,* 980 F.2d at 95, is far less clear here. In *Loretto,*

5. The apparent inconsistencies between the two takings theories have not escaped comment by academics:

> Together the Supreme Court's decisions in *Loretto* and *Penn Central* superbly illuminate the inconsistencies and contradictions of present-day takings law. Two New York City property owners challenged two New York City ordinances under the Takings Clause. Loretto, who suffered a minute physical intrusion but demonstrated no economic loss, received the full support and protection of the Constitution and was compensated. Penn Central, which sustained no actual intrusion but suffered a presumably large economic loss, received no compensation at all and was essentially told that the sacrifice was the cost of living in an ordered society.

> Dennis H. Long, *The Expanding Importance of Temporary Physical Takings: Some Unresolved Issues and an Opportunity for New Directions in Takings Law,* 72 IND. L.J. 1185, 1191 (1997).

the Supreme Court expressly distinguished its set of facts from those involving a temporary occupation. The Court stated:

> The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical invasion is a taking. As *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), and the intermittent flooding cases reveal, such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

*Loretto,* 458 U.S. at 436 n. 12, 102 S.Ct. at 3176 n. 12. Indeed, the *Loretto* majority cautioned that "[o]ur holding today is very narrow." 458 U.S. at 441, 102 S.Ct. at 3179.[6]

The *Loretto* majority did not, however, provide a precise definition for the term "permanent." Justice Blackmun, joined by two other justices in dissent, strongly criticized this oversight:

> Surprisingly, the Court draws an even finer distinction today—between "temporary physical invasions" and "permanent physical occupations." ... [W]hat does the Court mean by "permanent"? Since all "temporary limitations on the right to exclude" remain "subject to a more complex balancing process to determine whether they are a taking," the Court presumably describes a government intrusion that lasts forever. But as the Court itself concedes, [the regulation at issue] does not require appellant to permit the cable installation forever, but only "[s]o long as the property remains residential and a CATV company

wishes to retain the installation." This is far from "permanent."

*Loretto,* 458 U.S. at 447–448, 102 S.Ct. at 3182–83 (Blackmun, J. dissenting) (internal citations omitted).

■ Since *Loretto,* only one reported case has had occasion to clarify this issue. Surprisingly, that court was confronted with facts strikingly similar to those presented here. In *Hendler v. U.S.,* 952 F.2d 1364 (Fed.Cir.1991), the Environmental Protection Agency ("EPA"), pursuant to a CERCLA remediation plan designed to combat groundwater contaminants from the Stringfellow Acid Pits, sought to monitor the flow of contaminated groundwater on nearby properties. After an owner refused permission, the EPA issued an order granting itself access to the owner's property for the purpose of "locating constructing, operating, maintaining, and repairing monitor/extraction wells." *Hendler,* 952 F.2d at 1369.

The Federal Circuit held that on the record before the trial judge the EPA remediation activity on plaintiff's property constituted a "permanent physical occupation." *Hendler,* 952 F.2d at 1378. The court emphasized that the wells were "some 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement." *Id.* Therefore, the *Hendler* court reasoned that there was "nothing 'temporary' about the wells." *Id.*

Based on this stated reasoning and the facts before the district court, the Federal Circuit's decision appears to be a logical extension of *Loretto* to a situation where "surveillance wells are at least as *'permanent'* ... as the CATV equipment in *Loretto.*" *Hendler,* 952 F.2d at 1376 (emphasis added). However, the *Hendler* court was not content to limit its holding to cement and stainless steel. Instead, the *Hendler* court went further, positing: " 'permanent' does not mean

---

**6.** This statement by the *Loretto* majority is likely a recognition that the multifactor test used for *regulatory takings is better suited to balance* competing interests; a balancing the Court has been loath to forego in favor of *per se* rules:

> The contrasting opinions of Justices Holmes and Brandeis in *Pennsylvania Coal* highlight the Court's balancing of governmental power and individual rights. It was out of this deci-

sion that regulatory takings doctrine was born. The direction the Court has generally taken since *Pennsylvania Coal,* however, has not been toward broad legal generalizations, but rather toward the balancing of individual factors and the use of ad hoc factual inquires. David S. Ardia, *Dolan v. City of Tigard: Takings Doctrine Moves Onto Unpaved Ground,* 24 REAL ESTATE L.J. 195, 208 (1996).

forever, or anything like it. A taking can be for a limited term—what is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute." 952 F.2d at 1376.[7]

Of course, as the *Hendler* court points out, all takings (in fact, all things) are in some sense "temporary." But stating this metaphysical truism does not obviate the necessity of providing a rational definition of the term.[8] The *Hendler* standard begs the question of what quantum of time is necessary to trigger a *per se* taking. Semantics aside, what the *Hendler* court has done, in essence, is to completely emasculate *Loretto*'s requirement of permanency. Under the *Hendler* test, how much time is enough to trigger a "permanent" taking: five minutes, five days, five weeks, five months, or five years? Presumably all of the above are compensable because they involve a "term of finite duration." *Hendler*, 952 F.2d at 1376. The only limit the *Hendler* court appears to put on its new definition of "permanent" is the altogether unhelpful statement that "temporary ... refers to those governmental activities which involve an occupancy that is transient and relatively inconsequential, and thus properly can be viewed as no more than a common law trespass *quare clausum fregit.*" 952 F.2d at 1377.

For its novel theory the *Hendler* court relied primarily on World War II seizure cases. *See Hendler*, 952 F.2d at 1376 (*citing Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)).

However, the cases cited do not support *Hendler's* holding, and, in fact, undercut its reasoning. The World War II seizure cases are factually inapposite because they involved total *appropriations*: i.e., the government appropriated the claimant's entire property, albeit for durations as little as 5½ months. Stated in modern takings lexicon the War Department seizure cases involved the destruction of one hundred percent of the economic value of the entire parcel of land, *see generally Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (applying *per se* rule where government action destroyed all economic value of the land), a situation that was not present in *Hendler* and which is not present here.

Furthermore, in stating that "a permanent physical occupation does not require in every instance that the occupation be exclusive, or continuous and uninterrupted," *see Hendler*, 952 F.2d at 1377, the *Hendler* decision is in clear conflict with Supreme Court precedent, particularly *Loretto*. The *Loretto* Court cautioned:

> The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical invasion is a taking. . . . [T]emporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

458 U.S. at 436 n. 12, 102 S.Ct. at 3176 n. 12; *see also Sanguinetti v. United States*, 264 U.S. 146, 149, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924) (taking must "constitute an actual,

---

**7.** The *Hendler* court's creative use of language calls to mind Lewis Carroll's famous passage:

> "When I use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."
> "The question is," said Alice, "whether you can make words mean so many different things."

Lewis Carroll, *Through the Looking Glass* 163.

**8.** This is not the only instance in which jurists have struggled with defining terms that do not allow for easy definition. For example, in at-

tempting to define the term "accident," Justice Cardozo wrote:

> "Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident." Halsburg, L.C. in *Brintons v. Turvey*, [1905]. On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance.

*Landress v. Phoenix Mutual Life Ins. Co.*, 291 U.S. 491, 499, 54 S.Ct. 461, 463–64, 78 L.Ed. 934 (1934) (Cardozo, J. dissenting) (citations omitted).

permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property"). Moreover, the *Hendler* standard is also in conflict with precedent in this circuit. In *Southview Associates,* the Second Circuit stated that a physical taking requires that the government action *"forever* den[y] the owner any power to control the use of the property." 980 F.2d at 95 (emphasis added).

Based on the foregoing, this Court reject's *Hendler's* contorted definition of the term "permanent." This Court will not give the word "permanent" any special meaning, but instead adopts a common definition of permanent, such as the following: "intended to exist or function for a long, indefinite period without regard to unforeseeable conditions." Random House Dictionary of the English Language (Unabridged Edition) (1979); *cf. Hiatt v. Department of Labor and Industries,* 48 Wash.2d 843, 297 P.2d 244, 246 (1956) (defining permanent as: " 'Continuing or enduring in the same state, status, place, or the like, without fundamental or marked change; not subject to fluctuation or alteration; fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient.' ") (*quoting* Webster's New International Dictionary (2d. ed.1954)).

Pursuant to the Testing Agreement, MOSA is obligated to remove the casings and pay for any damage to Plaintiffs' property if it chooses not to acquire Plaintiffs' property through eminent domain. The only issue that remains is whether the structures MOSA placed on Plaintiffs' property are so attached to Plaintiffs' property as to be "permanent."

According to the affidavit of Michael McNerney, MOSA's supervising engineer, 24 monitoring wells and 8 piezometers remain on the property. (McNerney Aff. ¶ 4). Each well/piezometer consists of a hole into which a PVC riser pipe has been inserted. The holes range in depth from 7 to 143 feet. (McNerney Aff., Ex. B). Some portion of the PVC pipe is perforated, or screened, to allow groundwater to enter the well. The area around the screened portion of the riser pipe is surrounded by a sand pack. Above the sand pack there is a low permeability

bentonite clay seal to prevent groundwater from rising or descending into the screened portion of the well. Above the bentonite seal the borehole is grouted with either concrete or bentonite, or a combination of both. The upper portion of the hole is filled with concrete to prevent water from entering the well. Finally, a protective casing, usually a four-inch steel or PVC piping is inserted over the well's riser pipe and fixed into the surface seal, extending 2 to 3 feet above the ground. (McNerney Aff. ¶¶ 5–8).

According to the Monitoring Well Decommissioning Protocol used by MOSA's engineers, decommissioning of the wells/piezometers consists of removing or destroying the well casing and surface seal, and filling the hole by pressure injection of cement bentonite grout. (McNerney Aff., Ex. C). Grout from the upper five feet of the hole is then removed and the area is backfilled with compacted native materials. (McNerney Aff., Ex. C).

Based on Defendants' description of its activities on Plaintiffs' property, the Court must conclude as a matter of law that the pressure injection of cement bentonite grout is "intended to exist or function for a long, indefinite period without regard to unforeseeable conditions," *see* Random House Dictionary of the English Language, and is thus permanent. Accordingly, MOSA's actions constitute a permanent physical taking entitling Plaintiffs to just compensation.

As to the amount of compensation, in this instance the value of the property taken by MOSA, i.e., the value of the land below the surface wherein MOSA has injected concrete and left any other "permanent" attachments to the land, is a question of fact properly left for a jury to determine. In arriving at the calculation of just compensation a factfinder is guided by well established principles.

In the event of a "partial taking" the measure of just compensation is the difference between the fair and reasonable market value of the land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking. *See, e.g., United States v. Dickinson,*

331 U.S. 745, 748–51, 67 S.Ct. 1382, 1385–86, 91 L.Ed. 1789 (1947); *U.S. v. Banisadr Bldg. Joint Venture,* 65 F.3d 374, 378 (4th Cir. 1995). Furthermore, when the value of the remainder depreciates because of the proposed use of the condemned portion, the owner is entitled to compensation both for that which is physically appropriated and for the diminution in value to the non-condemned property. *Dickinson,* 331 U.S. at 748–51, 67 S.Ct. at 1385–86; *United States v. Miller,* 317 U.S. 369, 375–77, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943). This latter amount "is often, though somewhat loosely, spoken of as severance damage." *Miller,* 317 U.S. at 375–77, 63 S.Ct. at 281.

 However, "[s]everance damages are compensable only if the landowner incurs a direct loss reflected in the marketplace that results from the taking.... [T]he landowner must demonstrate that the taking caused the severance damages." *United States v. 760.807 Acres of Land,* 731 F.2d 1443, 1448 (9th Cir.1984) (citations omitted); *see also Miller v. United States,* 223 Ct.Cl. 352, 620 F.2d 812, 828 (1980) (owner must show loss in market value of remainder to receive severance damages). Moreover, compensation is due only for damages directly attributable to the *permanent* taking; compensation is not due for areas that will regrow or return to their pre-taking condition. *See United States v. 101.88 Acres of Land,* 616 F.2d 762, 767–72 (5th Cir.1980) (damages from dumping of spoil on remainder of property not compensable as severance damage); *United States v. 3.317.39 Acres of Land,* 443 F.2d 104, 106 (8th Cir.1971) (damage from flooding beyond that described in declaration of taking not compensable as severance damage).

### ii. The Testing Agreement

 In support of its motion for summary judgment, Defendant argues that the Testing Agreement granted MOSA permission to use Plaintiffs' property and limits any subsequent damage claims. Although Plaintiffs' decision to enter into the Testing Agreement appears on its face to be voluntary, Plaintiffs state that the agreement does not represent their consent to the use and occupation because MOSA's power under New York's Eminent Domain Law deprived Plaintiffs of the power to refuse.

A material distinction exists between a consent form freely entered into and an agreement entered into that contemplates activities on Plaintiffs' property which, but for MOSA's statutory authority to force entry, Plaintiffs would not have allowed. " 'This element of required acquiescence is at the heart of the concept of occupation.' " *Yee,* 503 U.S. at 526, 112 S.Ct. at 1528 (*quoting F.C.C. v. Florida Power Corp.,* 480 U.S. 245, 252, 107 S.Ct. 1107, 1112, 94 L.Ed.2d 282 (1987)). In *F.C.C. v. Florida Power,* the Supreme Court specifically acknowledged that a statute compelling a landowner over his objection to rent his property may amount to a taking by physical occupation. 480 U.S. at 252 n. 6, 107 S.Ct. at 1111–12 n. 6. In the present case New York Eminent Domain Procedure Law section 404 authorized a mandatory physical occupation of Plaintiffs' property. Accordingly, sufficient evidence exists to raise a genuine issue of material fact as to whether Government compulsion was present, thus obviating Plaintiffs' consent.

This is not to say, however, that the Testing Agreement, if voided, would no longer be relevant to this case. On the contrary, if it is found that MOSA's actions constituted a permanent physical occupation of Plaintiffs' property requiring just compensation, the $1,000 paid by MOSA under the Testing Agreement and MOSA's obligation to pay for damages are relevant in the calculus as to whether Plaintiffs have been justly compensated.

### III. CONCLUSION

In summary, the Court finds that Plaintiffs' takings claim premised on a regulatory takings theory of liability is not ripe. However, Plaintiff's takings claim premised on a physical taking theory is both ripe and compensable. Furthermore, the Court finds that sufficient evidence exists to raise a genuine issue of material fact as to whether Government compulsion obviated Plaintiffs' consent in signing the Testing Agreement.

For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**